AO 91 (Rev. 11/11)   Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT
07/05/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ AP ___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California  ▼

FILED
CLERK, U.S. DISTRICT COURT
7/5/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ KC ___ DEPUTY

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Jonathan Caballero | ) | Case No.   5:23-mj-00320 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 11, 2022___ in the county of ___Riverside___ in the ___Central___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distribution of at Least 50 Grams of Methamphetamine. |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

/s/
_Complainant's signature_

Paul Kirwan, Special Agent
_Printed name and title_

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   July 5, 2023

_Judge's signature_

City and state:   Riverside, California        Honorable Sheri Pym, Magistrate Judge
_Printed name and title_

_AUSA:_ Peter Dahlquist

**AFFIDAVIT**

I, Paul Kirwan, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrants against the following:

   a. Jonathan Caballero ("CABALLERO") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of at Least 50 Grams of Methamphetamine) on August 11, 2022;

   b. Nicoli Edmund ("EDMUND") for a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) on November 1, 2022;

   c. Joselyn Villalobos ("VILLALOBOS") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of at Least 50 Grams of Methamphetamine) on September 12, 2022; and

   d. Joshua Jester ("JESTER") for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of at least 50 Grams of Methamphetamine) and 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) on June 29, 2023.

2. This affidavit is also made in support of an application for warrants to search the following digital devices, as described in Attachment A-1 and A-2, for the items to be seized in Attachment B, which are evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(g) (Prohibited Person in Possession of a firearm), 922(a)(1)(A) (Dealing in Firearms without a License), 922(n) (Interstate Travel with Intent to Engage in the Business of Dealing Firearms without a License), § 2 (Aiding and Abetting), and 371

(Conspiracy), and 21 U.S.C. § 846, (Distribution, Possession with Intent to Distribute, and Conspiracy to Distribute Controlled Substances) (the "SUBJECT OFFENSES"), as described in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

       a.    JESTER's iPhone 14 inside a clear case, with a "Major League Sipping" sticker on back (SUBJECT DEVICE #1);

       b.    CABALLERO's iPhone, with phone number ending in 4413 (SUBJECT DEVICE #2);

       c.    CABALLERO's iPhone, with phone number ending in 9339 (SUBJECT DEVICE #3);

       d.    M.D.C's iPhone inside a clear plastic case, with silver trim and a white back, cracked screen, and has two cameras (SUBJECT DEVICE #4);

       e.    M.D.C.'s iPhone, no case, white in color, gold/bronze colored trim with a cream colored back and no SIM Card (SUBJECT DEVICE #5);

       f.    JESTER's iPhone X with a dark grey back and two small size cameras (SUBJECT DEVICE #6); and

       g.    JESTER's iPhone 11 with a dark grey back and two cameras (SUBJECT DEVICE #7).

    3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth

all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

4.   I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since May 2017.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.  I am an ATF Interstate Nexus Expert and routinely examine firearms and ammunition to determine their origins and travel in interstate commerce.  During my time as an ATF SA, I have testified as an expert witness in federal court, participated on multiple different task forces, and assisted in multiple narcotics and firearms investigations.  Based on my training and experience, and on my conversations with other ATF SAs, I am familiar with the investigation of federal firearms and drug crimes.  I have experience in processing and analyzing both computer and cell phone data, including data from email accounts, as the result of executing multiple search warrants on digital devices.  I have experience in handling and utilizing confidential informants for information as well as planning controlled purchases for firearms and narcotics.

## III. **SUMMARY OF PROBABLE CAUSE**

5.   Beginning in August 2022, an ATF SA acting in an undercover capacity (the "UC") conducted multiple controlled purchases of drugs and firearms involving CABALLERO and his

3

associates VILLALOBOS and JESTER.  As of the writing of this affidavit, the UC purchased approximately thirty-three firearms and approximately nine pounds of methamphetamine from CABALLERO and his associates.  From the investigation and the UC interacting with CABALLERO, agents discovered that EDMUND is one of CABALLERO's gun suppliers and, later on in the investigation, JESTER became another supplier for CABALLERO.  EDMUND conspires with people in the State of Arizona who purchase firearms on his behalf in Arizona.  During the investigation, agents learned that EDMUND primarily communicates with an individual identified as Christian Taylor who buys firearms and recruits others to buy firearms.  Taylor then held the firearms for EDMUND, who makes frequent trips to Arizona to pick up the firearms from Taylor and transport them back to Riverside County, California, for resale.  Once the firearms are in Riverside County, EDMUND sells firearms to multiple different people (including CABALLERO, who then sold the firearms to the UC).

6.    EDMUND's phones were reviewed pursuant to a federal search warrant, and communications between EDMUND and CABALLERO confirmed that they were trafficking in firearms together, including some of the firearms that CABALLERO sold to the UC.

7.    Later in the investigation, beginning in May 2023, investigators identified JESTER as a new source of firearms. JESTER and other co-conspirators would work with a straw purchaser in the State of Arizona, primarily Derrick Kennedy, to purchase firearms, transport them back to Riverside County and sell those firearms to CABALLERO for profit.

8.   I seek a criminal complaint against these CABALLERO, EDMUND, VILLALOBOS, and JESTER relating to four specific incidents:

a.   On August 11, 2022, CABALLERO met with the UC and personally sold the UC two pistols and three pounds of methamphetamine.

b.   On November 1, 2022, law enforcement conducted a traffic stop on EDMUND, a convicted felon, as he was driving back from Arizona on I-10 through Palm Springs after the UC had set up a gun purchase.  EDMUND was the only person in the vehicle at the time.  Law enforcement officers then executed a federal search warrant for the vehicle.  Inside the vehicle, law enforcement found an AR-style pistol and an empty manufacturer's box for a distinct kind of firearm that CABALLERO had arranged to sell the UC that same day.  Law enforcement also searched EDMUND's home pursuant to a federal warrant and found the firearm matching that box.

c.   On September 12, 2022, VILLALOBOS met with the UC and personally sold the UC one pound of methamphetamine and five pistols.  Surveillance then showed that she met with CABALLERO and EDMUND after the transaction and gave the money from the deal to CABALLERO.

d.   On June 29, 2023, JESTER met with CABALLERO and a juvenile (M.D.C.), and JESTER then drove M.D.C. to meet with the UC so M.D.C. could sell the UC approximately five pounds of methamphetamine and six firearms.  JESTER supplied the firearms for this transaction and CABALLERO likely supplied the majority

5

of the methamphetamine, but, in a <u>Mirandized</u> interview, JESTER admitted that he picked CABALLERO and M.D.C. up and drove him to the deal knowing that CABALLERO and M.D.C. was selling the UC methamphetamine as part of a deal for both guns and methamphetamine.

9.   I also seek a warrant to search the SUBJECT DEVICES. Officers recovered the SUBJECT DEVICES following the controlled purchase on June 29, 2023, and confirmed that they belonged to CABALLERO, JESTER, and M.D.C. involved in the transaction.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Identification of CABALLERO as Illegal Firearms Dealer**

11.   Following multiple discussions with law enforcement at different local departments, ATF learned that an individual using the Instagram account "chapofromthemurda" was advertising firearms for sale.  I viewed several photos/videos from the Instagram account and also concluded that "chapofromthemurda" was using social media to market firearms for sale.  CABALLERO, who goes by the moniker "Chapo," was previously known as the user of the Instagram account based on photos that he has posted of himself on social media as well as past contacts with law enforcement.  I also saw CABALLERO marketing a firearm for sale that was bought by another person in Arizona shortly before

CABELLERO posted it for sale, indicating illegal firearms trafficking activity.[1]

12.   Based on the potential illicit firearms activity, I advised the UC to reach out to CABALLERO via his Instagram account and begin to discuss firearms.

13.   On October 27, 2022, the Honorable Kenly Kiya Kato, United States Magistrate Judge for the Central District of California, signed a search warrant for the Instagram account "chapofromthemurda" and another Instagram account used by CABALLERO in Case Numbers 5:22-MJ-672 and 676.

**B.    Controlled Purchase with CABALLERO on August 3, 2022**

14.   The UC messaged with CABALLERO on Instagram and arranged to purchase a firearm from CABALLERO at CABALLERO's home.[2]  On August 3, 2022, a UC conducted a controlled purchase of one firearm, a 9mm privately made firearm ("PMF," commonly

---

[1] Though private-party firearm sales are not inherently illegal, firearm purchasers must fill out background forms and certify, when purchasing a firearm from a federal firearm licensee ("FFL"), that they are purchasing the firearm for themselves.  Purchasing a firearm from an FFL and then selling the firearm (or otherwise transferring possession to another person who sells the firearm) shortly after the purchase is strongly indicative of a straw purchase in my training and experience, which constitutes various federal crimes (e.g., false statements to an FFL if the purchaser lied about purchasing the firearm for him/herself, a violation of 18 U.S.C. § 922(a)(6)).

[2] This purchase and every other purchase discussed herein were arranged under similar circumstances.  Either (1) the UC would see CABALLERO post an Instagram story offering a firearm for sale and the UC would reach out, via Instagram direct message, to arrange the purchase; (2) CABALLERO would send direct message the UC offering a particular item for sale; or (3) the UC would send CABALLERO a direct message asking if CABALLERO had a particular item for sale.

known as a ghost gun), from CABALLERO[3] for $1,000.[4]  The sale happened at 24788 Eucalyptus Avenue, Moreno Valley, California. I ran that address through a law enforcement database, and the database showed that CABALLERO was associated with that address.

### C.   Controlled Purchase with CABALLERO on August 4, 2022

15.   On August 4, 2022, the UC again conducted a controlled purchase of one firearm, a CZ Scorpion 9mm pistol bearing serial number F325102, from CABALLERO for $2,000.  The firearm was loaded with approximately thirteen rounds of ammunition.  The controlled purchase occurred at an undercover location in the Riverside, California, area (the "UC location").[5]

16.   During the controlled purchase, CABALLERO stated that he is involved in another "business" in addition to firearms.

---

[3] I initially identified CABALLERO because the tip from local law enforcement above mentioned CABALLERO by name.  I retrieved a booking photo from CABALLERO's previous arrest and CABALLERO's California driver's license photo, and they matched the person depicted in numerous photos throughout the Instagram accounts and the person who ultimately showed up to all of the controlled purchases.  And, as I discuss in this affidavit, later investigation further confirmed his identity.

[4] The UC was wearing covert audio- and video-recording equipment during the purchase, and I have reviewed the footage. I also showed the UC CABALLERO's booking photos and driver's license photo after the purchase, and he confirmed that the seller was CABALLERO.

[5] The UC location is a controlled location that ATF has built to look like a legitimate business.  The location is equipped with high-quality audio and video surveillance equipment that records each room of the location whenever agents conduct controlled purchases inside.  The location also has areas where agents covertly remain inside and view the audio and video feeds in real time during controlled purchases.  When an ATF UC conducts controlled purchases in the location, other agents also remain outside around the building and conduct surveillance.  I have reviewed the audio and video surveillance depicting the controlled purchases at the UC location and spoken with the UCs about the purchase.  Additionally, I was at the UC location conducting surveillance during the purchases.

CABALLERO indicated that he sells methamphetamine, but he only sells in pound quantities.  CABALLERO quoted a sales price of approximately $1,000 per pound.

17.  CABALLERO also explained that he has an associate who obtains firearms from Arizona who primarily sells Glocks and Dracos (AK-type pistols).  CABALLERO gave a break-down on the firearms trafficking activity, including how it is done, costs, etc.

**D.    Controlled Purchase with CABALLERO on August 11, 2022**

18.   On August 11, 2022, the UC conducted a controlled purchase of two 9mm PMF handguns and three pounds of methamphetamine (as confirmed by a DEA laboratory analysis) from CABALLERO at the UC location.  The two pistols cost $1,000 per firearm.  The methamphetamine cost $1,200 per pound for the first two pounds, and the third pound for $900.  In total, the UC paid CABALLERO $5,400.

19.  During the controlled purchase, the UC and CABALLERO again discussed his Arizona source for firearms.

**E.    Controlled Purchase and Surveillance of CABALLERO on August 17, 2022**

20.   On August 17, 2022, the UC arranged a controlled purchase with CABALLERO for five firearms, four of which were new or like-new commercially manufactured Glock handguns.  Once the terms of the transaction were agreed upon, CABALLERO sent an unidentified female ("UF") to deliver the firearms to the UC at the UC location.

21.   Prior to the controlled purchase, CABALLERO had advised the UC that he was having a female associate deliver the firearms and accept payment on his behalf.  The UC told CABALLERO that he would prefer for CABALLERO to deliver the firearms, to which CABALLERO responded that he had to start "moving like a boss with runners."

22.   During the purchase, the UF driver arrived at the UC location, retrieved a diaper box from the vehicle, and handed it to the UC.  The UC placed the diaper box on the table, removed diapers from the top, and saw a firearm as well as several pistol cases underneath.  The UC inspected all of the firearms, which included:

        a.   Glock Model 23, .40 caliber pistol, s/n: BWWM645;

        b.   Glock, Model 23GEN5, .40 caliber pistol, s/n: BXHR654;

        c.   Glock, Model 17, 9mm pistol, s/n: BSHD154;

        d.   Glock, Model 23, .40 caliber, s/n: CKM125US; and

        e.   PMF Pistol

23.   In addition to the firearms, there were approximately ten rounds of 9mm ammunition and nineteen rounds of .40 caliber ammunition.

24.   For the five firearms, the UC paid CABALLERO (via the UF) a previously agreed price of $6,200.  The pricing breakdown was $1,300 per Glock and $1,000 for the PMF pistol.  The cash, at the request of CABALLERO, was placed in a small cardboard box sealed by tape.  CABALLERO advised that he did not want the UF to know how much money he was receiving from the UC.

25.   Before the controlled purchase, ATF SA Valerie Atwood
and I were conducting mobile surveillance outside of the UC
location.  While conducting surveillance, SA Atwood saw the UF
pull into the parking lot across the street from the UC
location.  CABALLERO exited the vehicle and stood outside
waiting, as the UF then departed and drove to the UC location
across the street.  I also saw CABALLERO standing across the
street waiting.  After the controlled purchase, the UF drove
back across the street, picked up CABALLERO, and left the area.

26.   SA Atwood and I followed CABALLERO and the UF driver.
The vehicle proceeded directly to CABALLERO's residence on
Eucalyptus Avenue, Moreno Valley (the site of the first
controlled purchase from CABALLERO).

27.   On or about August 22, 2022, I queried ATF records for
the firearms purchased from CABALLERO on August 17 and learned
the following regarding their purchase history:

a.   The Glock, Model 23, serial number BWWM645, was
purchased in the State of Arizona on August 12, 2022, just five
days before the controlled purchase, by Evette Tripp, Taylor's
wife.

b.   The Glock Model 23GEN5, serial number BXHR654,
was purchased in the State of Arizona on August 10, 2022, just
seven days prior to the controlled purchase, by Molly Pfeifer.

28.   This controlled purchase helped initially identify
Tripp and Pfeifer as straw purchasers, both of whom are
associated with Taylor in the State of Arizona who are currently
under investigation for federal firearms violations.

**F.   Controlled Purchase and Surveillance on September 12, 2022**

29.   On September 12, 2022, the UC arranged a controlled purchase with CABALLERO for five firearms and one pound of methamphetamine.  Once the terms of the transaction were agreed upon, CABALLERO again sent a female to deliver the firearms and narcotics to the UC at the UC location.  The female (later identified as VILLALOBOS[6]) met with the UC at the UC location and sold him the five firearms and one pound of methamphetamine. The UC removed a duffle bag in the trunk of VILLALOBOS's vehicle and examined the contents.  Inside the bag was approximately one pound of methamphetamine (as confirmed by a DEA laboratory analysis) and the below listed firearms:

> a.   Glock, Model 43, 9mm pistol, s/n: BDRF986;
>
> b.   Glock, Model 27, .40 caliber pistol, s/n: KCL968;
>
> c.   Glock, Model 27, .40 caliber pistol, s/n: PBF790;
>
> d.   Glock, Model 45, 9mm pistol, s/n: BWVL347; and
>
> e.   PMF pistol, 9mm

30.   Approximately sixteen rounds of 9mm ammunition were included with the firearms.

31.   After the UC examined the items, he gave VILLALOBOS the previously agreed upon amount of $7,200 in a small cardboard

---

[6] I initially identified VILLALOBOS by running records checks for the vehicle she drove to the UC location.  Though the car was not registered in her name, law enforcement databases showed her associated with the car, so I pulled her driver's license photo, compared it to the person I saw on surveillance, and saw that they were the same person.  The ATF UC also identified VILLALOBOS by looking at her driver's license photo and confirming that she was the person with whom the UC interacted.

box.  After VILLALOBOS received the box containing the funds, she left the UC location.

32.  Multiple surveillance units were in place to follow VILLALOBOS to potentially identify the firearms trafficker. Upon her departure, the surveillance team followed her to the University Village parking lot near the Buffalo Spot restaurant located at 3470 Iowa Avenue, Riverside, California.  VILLALOBOS parked near a Gold Dodge Ram 4-door truck in the parking lot. At that point, CABALLERO got out of the passenger seat of the truck and walked over to VILLALOBOS who then handed him the small box containing the money the UC had given VILLALOBOS for the controlled purchase of firearms and narcotics.  Once CABALLERO had the box in hand, he then returned to the passenger side of the truck and got back inside.  The individual sitting in the front driver's seat of the truck was later identified as EDMUND.  I believe CABALLERO was likely distributing funds to EDMUND for the firearms.

33.  Shortly after CABALLERO received the money from VILLALOBOS, CABALLERO and EDMUND exited the truck and briefly stood in the parking lot speaking to each other.  While the truck was parked in the lot, surveillance units were able to observe the license plate, which was a State of Arizona plate.

34.  Surveillance units queried the Arizona plate on the truck using law enforcement databases and learned that the truck was registered to EDMUND.  Surveillance units received a copy of EDMUND's driver's license photo from law enforcement databases and surveillance units identified the individual with CABALLERO

13

and VILLALOBOS as EDMUND.  The truck was registered to an address in the City of Phoenix, but it also had a registration address located at an apartment on Hemlock Avenue in Moreno Valley, California.

35.  CABALLERO, EDMUND, and VILLALOBOS then walked into the Buffalo Spot restaurant, ordered food, and sat down in the restaurant together.  ATF TFO Steven Leone walked into the restaurant and saw the three of them ordering food together. After eating, all parties returned to the parking lot. CABALLERO and VILLALOBOS left together, and EDMUND left alone in the truck.

36.  Surveillance units continued to follow EDMUND and the truck as he returned to his Hemlock Avenue apartment in Moreno Valley.  Once EDMUND entered the apartment, the surveillance team concluded surveillance.  I then reviewed EDMUND'S criminal history and learned that EDMUND is a multiple convicted violent felon and is prohibited from possessing firearms and or ammunition.

37.  I reviewed ATF records for the firearms acquired from CABALLERO during the controlled purchase and learned the following:

a.  Of the five firearms purchased, four were commercially manufactured Glock handguns, all originally purchased in the State of Arizona.

b.  Two of the firearms, a Glock Model 21, serial number PBF790, and a Glock, Model 27, serial number KCL968, were purchased on September 8, 2022, as referenced in a multiple

14

sales report in the State of Arizona.  Both firearms were in ATF custody on September 12, just four days after they were purchased in the State of Arizona.

   c.   The two Glock, Model 27 handguns were purchased by Tripp.  One of the firearms in the previous controlled purchase was also purchased by Tripp.

### G.   The Buffalo Spot Restaurant Surveillance Video

38.  On September 17, 2022, TFO Leone and I went to the Buffalo Spot restaurant and reviewed surveillance footage which clearly identified EDMUND, CABALLERO and VILLALOBOS all order together.

39.  I later submitted photos captured from the restaurant surveillance footage to the Riverside County Sheriff's Department for facial recognition analysis.  On or about September 29, 2022, I received a response positively identifying EDMUND and CABALLERO.

### H.   On September 23, 2022, GPS Tracking Device Used on EDMUND'S truck

40.  On September 19, 2022, the Honorable Shashi H. Kewalramani, United States Magistrate Judge for the Central District of California, signed a vehicle tracker warrant in case number 5:22-MJ-00595, authorizing ATF to track EDMUND'S truck with a GPS tracking device.

41.  On September 23, 2022, EDMUND'S truck was parked in front of his Hemlock Avenue apartment in Moreno Valley.  After conducting surveillance, the GPS tracking device was

15

successfully deployed on the EDMUND's truck at approximately 12:17 a.m.

**I.   EDMUND Travels to Arizona on September 23, 2022, and Returns to Moreno Valley on September 26, 2022**

42.   As shown by the GPS data, later in the afternoon on September 23, 2022, EDMUND's truck traveled to the Phoenix area in Arizona.  The truck arrived at what was later learned to be EDMUND's Arizona residence (where he would stay when in Arizona).  The following morning, an Arizona ATF TFO conducted surveillance of EDMUND'S truck and saw the truck was parked directly in front of 1826 East Harvard Street, Unit A.

43.   I monitored the tracking device on EDMUND'S truck, and according to the tracking data, EDMUND's vehicle went to Tripp and Taylor's residence on September 25 and again on September 26, right before departing Phoenix for California.  Based on information obtained during the investigation, I believe EDMUND was picking up firearms from Taylor purchased by Tripp and Molly Pfeifer.

44.   The UC was communicating with CABALLERO on Instagram at this time.  I notified the UC that EDMUND had returned to Arizona and requested that the UC inquire regarding a firearm order the UC had previously requested through CABALLERO, consisting of five new Glock pistols and one new Draco pistol. Early in the morning on September 23, 2023, CABALLERO responded to the UC that there were two Dracos available for sale.  Later that same morning, the UC confirmed with CABALLERO that they were on for Tuesday (September 27, 2022) for a controlled

purchase of firearms.  CABALLERO confirmed the five Glocks were available, and later in the day, CABALLERO confirmed that the UC wanted two Dracos (not just the one that the UC had requested).

45.  On September 26, 2022, CABALLERO reached out to the UC asking if they were good for the deal on the next day. CABALLERO quoted the UC a price of $11,000 for all seven firearms.  The UC confirmed with CABALLERO and agreed on the price.

46.  During the evening of September 26, 2022, I reported to the UC that EDMUND and his truck were traveling westbound on Interstate 10 and likely returning with the firearms that CABALLERO would sell during the controlled purchase that would likely occur the following day.  I monitored the vehicle GPS tracker and saw that EDMUND'S truck arrived at the address associated with CABALLERO, the house on Eucalyptus Avenue, Moreno Valley.  I know CABALLERO often lives at this residence or conducts business from this address from previous surveillance as well as the controlled purchase that occurred at that address earlier in August 2022.

**J.    Controlled Purchase and Surveillance on September 27, 2022**

47.  On September 27, 2022, the UC arranged a controlled purchase with CABALLERO, indirectly involving EDMUND, for seven firearms.  Once the terms of the transaction were agreed upon, CABALLERO sent VILLALOBOS to deliver the firearms on his behalf. VILLALOBOS met with another UC at the UC location and sold him

the seven firearms (five Glock pistols and two Dracos) for the previously agreed upon amount of $11,000.

48. At the conclusion of the controlled purchase, multiple surveillance units were in place at: (1) EDMUND'S Hemlock Avenue Apartment in Moreno Valley where his truck remained parked during the controlled purchase, (2) VILLALOBOS's apartment in Moreno Valley, and (3) outside of the UC location.

49. I was conducting surveillance outside of the UC location when I saw VILLALOBOS driving away from the UC location in a white Mercedes Benz. I also saw that the Mercedes was being followed by what appeared to be a black Toyota Camry (EDMUND's wife/girlfriend's vehicle). I waited for both vehicles to pass, then also turned eastbound to follow VILLALOBOS. The Mercedes came to a red light, at which point black Camry got into the lane adjacent to VILLALOBOS and began to drive past her when the light turned green. The tint on the black Camry was too dark, and I could not see the occupants inside. I continued to follow VILLALOBOS, when she then turned onto the 215 Freeway southbound, towards Moreno Valley. The black Camry also appeared to get on the freeway ahead of VILLALOBOS, but I was unable to see both vehicles and continued to surveil the Mercedes. I saw the Mercedes travel southbound towards the Box Springs Road area. At this point, I believed the Mercedes was likely returning to the Moreno Valley area to a known location and did not follow the Mercedes further.

50. Several minutes later, Riverside County Sheriff's Department Investigator Ortiz, who was surveilling EDMUND'S

residence and his truck, saw both VILLALOBOS's Mercedes and the black Toyota Camry arrive at EDMUND's apartment complex and park.  Investigator Ortiz saw EDMUND exit the front driver's door of the black Toyota Camry and CABALLERO exit the front passenger seat.  EDMUND and CABALLERO spoke for a moment and went out of view briefly in the courtyard area.  EDMUND then returned into view, got into his Dodge Ram truck, and left the area.  CABALLERO then walked out of the apartment complex onto Hemlock Avenue, departing the area.

51.  VILLALOBOS had two additional occupants in the Mercedes.  An unidentified Black male exited the front, passenger seat and an unidentified Hispanic male exit the back seat (who accompanied her during the controlled purchase).  Both individuals went to the courtyard area of the complex and were eventually out of view of the surveillance team.  VILLALOBOS then left the area in her Mercedes.

52.  I had seen the black Toyota Camry before September 27, 2022, based on prior surveillance.  The Camry is registered to L.S. at EDMUND'S Moreno Valley apartment.  Based on prior surveillance, TFO Leone saw L.S. use the Camry and then enter the apartment.

53.  During the controlled purchase, the following firearms were acquired by ATF:

     a.  Romarm/Cugir, Mini Draco, 7.62mm pistol, s/n: 22PG-5593;

     b.  Century Arms Int., VSKA, 7.62mm pistol, s/n: SV7P008780;

  c. Glock, 27GEN5, .40 caliber pistol, s/n: BXSM651;

  d. Glock, 27, .40 caliber pistol, s/n: AGSP916;

  e. Glock, 19GEN3 Mariner, 9mm pistol, s/n: BETK845;

  f. Glock, 43, 9mm pistol, s/n: AGLB070; and

  g. Glock, 43X, 9mm pistol, s/n: BKYC559.

54. Of those firearms, five were purchased by Pfeifer.

**K. Identification of Straw Purchasers**

55. During this investigation, Pfeifer has been responsible for the purchase of six firearms, five of which were acquired by ATF during the September 27, 2022, controlled purchase. Pfeifer purchased those firearms from FFLs between four and fourteen days before the controlled purchase. In total, I have identified approximately 32 firearms purchases made my Pfeifer since February 2022, approximately nine of which have been recovered in California. Pfeifer is a friend/associate of Taylor. The investigation also found frequent Cash App money transfers between Taylor and Pfeifer corresponding with firearms purchasing activity.

56. During this investigation, Tripp has purchased three firearms which have been recovered by ATF during the controlled purchases. In total, I have identified approximately twenty firearms purchases by Tripp since June 2020, nine of which have been recovered by law enforcement (eight in California and one in Illinois). Tripp resides with Taylor and is married to Taylor.

57. This investigation also identified another apparent straw purchaser, Desmond Murphy. Murphy was initially

identified as the original purchaser on a firearm CABALLERO was offering for sale back in March 2022 (previously mentioned above).  A review of Taylor's financial records, obtained via subpoena, identified frequent Zelle money transfers to Murphy. I have identified approximately nineteen firearms purchased by Murphy, four of which have been recovered by law enforcement (three in California and one in Florida).  The investigation into Murphy is still ongoing, but it appears Murphy is also an associate/friend of Taylor.

**L.   Search Warrants for EDMUND'S Residence and Vehicle and EDMUND's Arrest**

58.  On October 20, 2022, the Honorable Sheri Pym, United States Magistrate Judge for the Central District of California, signed search warrants in case numbers 5:22-MJ-00658, 5:22-MJ-00660, and 5:22-MJ-00661, authorizing ATF to search EDMUND'S Moreno Valley, California residence, his Dodge Ram truck that was being tracked, and the black Toyota Camry also associated with EDMUND.

59.  On October 31, 2022, the UC advised me that CABALLERO said he would have a new Draco firearm to sell the UC and that it would be available on Tuesday, November 1.  I then checked the GPS vehicle tracker and saw that EDMUND's truck was driving eastbound on Interstate 10 toward Arizona.  Shortly after arriving in Phoenix, EDMUND's truck arrived at Taylor's residence.  Based on my investigation, I knew that EDMUND was likely returning to Arizona to acquire more firearms and to return with them to California for illegal distribution.  As a

result, I monitored the GPS tracker, and late in the evening, near midnight, I saw that EDMUND was likely returning to California, as he was traveling westbound on Interstate 10.

60.   On November 1, at approximately 6:00 a.m., other law enforcement agents and I were staged along Interstate 10 near Palm Springs.  I was monitoring the GPS tracking device when I saw EDMUND's truck on the freeway.  I followed and identified his vehicle, and Riverside County Sheriff's Department vehicles then initiated a traffic stop of EDMUND pursuant to the federal search warrant for his vehicle.  EDMUND was the sole occupant of the vehicle.  EDMUND exited the freeway and pulled over.  EDMUND was detained pending service of the warrant.

61.   Agents then searched his vehicle and found an AR-style pistol, more specifically, a Radical Firearms LLC, multi-caliber, Model RF-15, s/n: 21-019553, in the backseat of the truck behind the driver seat.  Adjacent to the firearm was a high-capacity magazine loaded with approximately seventeen rounds of ammunition.

62.   Also in the backseat was a cardboard gun box that typically holds a firearm when purchased from a gun store.  The box was empty, but the side of the box identified that it previously held a Romarm/Cugir, 7.62mm, Micro Draco pistol, with s/n: 22PMD-32165.  This was the type of firearm that the UC was going to purchase from CABALLERO that day.  Agents also seized two cellphones located near the driver seat.

63.  I looked in the glove box of the truck and found Arizona vehicle registration paperwork showing the vehicle is registered to EDMUND, listing his Moreno Valley address.

64.  In the vehicle, I also found a dark grey baseball cap with a black brim and no logo.  This was significant because it is the same type of baseball cap that EDMUND was wearing when meeting with CABALLERO and VILLALOBOS at the Buffalo Spot restaurant after the September 12, 2022, controlled purchase.

65.  Following the search warrant, EDMUND was booked into the Riverside County Jail on multiple firearms violations, including felon in possession of a firearm and possession of unregistered assault weapons.

66.  Later that day, other law enforcement agents and I also executed the search warrant of EDMUND's Moreno Valley residence.  During the search, law enforcement found the Romarm/Cugir, 7.62mm, Micro Draco pistol, with s/n: 22PMD-32165 matching the gun box found in EDMUND's truck.  This firearm was later traced, and it was discovered that the firearm was purchased on October 26, 2022, just six days earlier.  Agents also found an empty gun box (with serial number scratched off) for a Taurus handgun, and multiple stacks of mail addressed to EDMUND adjacent to where the firearm was located.

**M.   EDMUND Mirandized Interview**

67.  Following search warrant service of EDMUND's truck.  I interviewed EDMUND regarding the incident.  I read EDMUND his <u>Miranda</u> rights from an ATF form.  I asked EDMUND about his residency status since he had a vehicle with Arizona plates but

maintained a California driver's license.  EDMUND advised that
he resides in both California and Arizona.

68.  EDMUND advised that he wanted to remain silent when
asked about firearms.

**N.   L.S. Mirandized Interview**

69.  During search warrant service of EDMUND's residence, I
interviewed L.S., EMDUND's girlfriend/wife.  L.S. was not
detained or under arrest, but I read L.S. <u>Miranda</u> rights from an
ATF form.  I asked L.S. if the firearm or any of the firearm
related materials found in the residence belonged to her.  L.S.
advised that those items do not belong to her.  I inquired about
EDMUND and his firearms activity, to which she stated that I
would have to ask him (EDMUND) about that.

**O.   Review of EDMUND's Cellular Phones**

70.  I reviewed the contents of the phones seized from
EDMUND's vehicle, pursuant to the federal search warrant.  I saw
multiple calls between EDMUND and Taylor.  I also saw multiple
calls between EDMUND and CABALLERO.  The call log shows regular
contact between EDMUND and Taylor and EDMUND and CABALLERO
throughout the month before.

71.  I also reviewed text messages between EDMUND and
CABALLERO discussing firearms, pricing for firearms sales, and
discussing scheduling for the controlled purchase on September
12.  I also saw that Taylor had messaged EDMUND attempting to
sell him a firearm.

72.  I reviewed many messages between EDMUND and other
individuals regarding buying and selling firearms.  The text

message conversations I reviewed included photos of firearms, types of firearms, and pricing.  This further leads me to believe that EDMUND is involved with the unlicensed sale of firearms.

73.  I also reviewed text message chains/threads with four photographs of two new Glock pistols that EDMUND was attempting to sell.  The photos show the exterior of the gun boxes and the other two photos show the two guns inside the box.

74.  I was able to query the serial numbers for the two firearms and discovered that one of the Glocks, a Glock 29, had been originally purchased by Pfeifer on May 23, 2022.  The text message chain on EDMUND's phone was dated June 3, 2022, just two weeks after the original purchase.

75.  The other gun, a Glock 30, was originally purchased by Taylor on April 14, 2022, and EDMUND was displaying a photograph of the gun via text message on May 14, 2022, just one month after the original purchase.

76.  Both of these photographs confirmed that Taylor and Pfeifer were straw purchasing firearms that were ultimately being sold/given to EDMUND.  Additionally, the photographs both appear to have been taken by EDMUND standing in his kitchen at his Moreno Valley residence.  This is based on my observations of his apartment while serving the search warrant at his residence.  The counter tops, cabinets and flooring in the photos are the same as what was observed in his apartment, indicating that the firearms photographed were already transported to California, likely by EDMUND.

**P.    Review of EDMUND and CABALLERO Text Messages**

77.   I reviewed text messages between EDMUND and CABALLERO. Below is a sampling of some of the text messages, specifically occurring between September 8-12, 2022.  EDMUND and CABLLERO exchange text messages regarding firearms and the coming plans and pricing for the controlled purchase that occurred on September 12, 2022.

78.   Below is an excerpt from the messages:

    CABALLERO: Yo

    CABALLERO: He said he is good for Monday it's confirmed[7]

    EDMUND: K

    CABALLERO: What's the ticket

    EDMUND: 1000

    CABALLERO: So 3k

    CABALLERO: Total

    EDMUND: 4500

    EDMUND: 4000

    CABALLERO: It's 4 of em?

    EDMUND: Yup

    CABALLERO: ight

79.   That same day, the UC purchased five firearms (four Glocks and one PMF) and one pound of methamphetamine from CABALLERO for approximately $7,200.  After reviewing the text messages, it appears EDMUND sold the firearms to CABALLERO for

---

[7] This is referring to the controlled purchased scheduled to occur with CABALLERO and the UC on Monday, September 12, 2022.

$1,000 per Glock and CABALLERO marked them up to the UC at approximately $1,200-$1,300 per Glock.

    **Q.   EDMUND's Criminal History**

    80.   On or about September 12, 2022, I reviewed the criminal history for EDMUND and learned that EDMUND has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

        a.   On or about August 4, 1997, a violation of California Penal Code Section 211, Robbery, in the Superior Court for the State of California, County of Riverside, Case Number INF027171;

        b.   On or about July 26, 2000, a violation of California Penal Code Section 212.5, Robbery, in the Superior Court for the State of California, County of Riverside, Case Number INF030202;

        c.   On or about July 26, 2000, a violation of California Penal Code Section 243(c), Battery of a Peace Officer/Emergency Personnel with Injury, in the Superior Court for the State of California, County of Riverside, Case Number INF035148;

        d.   On or about July 26, 2000, a violation of California Penal Code Section 243(c), Battery of a Peace Officer/Emergency Personnel with Injury, in the Superior Court for the State of California, County of Riverside, Case Number INF035148; and

        e.   On or about April 2, 2010, a violation of California Penal Code Section 245(c), Assault with a Deadly

Weapon on a Peace Officer/Firefighter with Great Bodily Injury, in the Superior Court for the State of California, County of Riverside, Case Number INF048115.

**R.   Controlled Purchase and Surveillance on May 25, 2023**

81.   Leading up to a controlled purchase occurring on May 25, 2023, the UC communicated with CABALLERO with the intent of being introduced to different CABALLERO associates engaged in unlawful firearms activity.   CABALLERO had since become a convicted felon and made comments about being on probation. CABALLERO advised the UC that he would provide him with his firearms contacts.   CABALLERO provided the UC with a list of eight different Glock pistol models at a price of $1,300 per firearm.   The UC picked out four of the firearms and stated he wanted to purchase those.   CABALLERO and the ATF UC then scheduled a day to conduct the transaction.   CABALLERO provided the ATF UC with a new phone number ending in 4413, stating this was his associate's number.

82.   On May 24, 2023, the UC was contacted by the 4413 number.   In a phone call, the caller asked, "is this the guy Chapo gave me?"[8]   The individual speaking and communicating with the UC was later identified as M.D.C. (a juvenile).   The UC and M.D.C. confirmed the controlled purchase for four Glocks to occur the following day.

83.   On May 25, 2023, M.D.C. told the UC that he would be sending someone to deliver the firearms.   On the same date at

---

[8] "Chapo" is one of CABALLERO's known monikers, as evidenced by his Instagram handle.

approximately 12:49 p.m., VILLALOBOS arrived at the UC location driving the same white Mercedes Benz sedan as observed in previous controlled purchases.  VILLALOBOS indicated that the firearms were in the trunk of the vehicle.  VILLALOBOS and the UC then went to the lounge area where the ATF UC removed the firearms from the duffel bag where they were stored, a "Cookies" duffel bag, and inspected all of the firearms in front of VILLALOBOS.  The UC then paid VILLALOBOS $5,200 for the four pistols.  VILLALOBOS asked if the UC could place the funds in an empty box, which the UC provided.  VILLALOBOS also advised that CABALLERO's "homie" is more involved now.

84.  Following the controlled purchase, surveillance units followed VILLALOBOS.  VILLALOBOS drove to a residence on Eucalyptus Avenue (the site of the first controlled purchase with CABALLERO).  VILLALOBOS was observed interacting with an individual appearing to be CABALLERO.  Directly across the street from VILLALOBOS was a newer black Mercedes SUV.  After VILLALOBOS left, the individual believed to be CABALLERO walked over to the Mercedes SUV and stood next to the open passenger door talking to the driver inside, possibly splitting the proceeds from the controlled purchase.

85.  I queried the Mercedes's license plate in law enforcement databases and learned that the vehicle is registered to M.H. at a residence on Dillon Avenue in the City of Indio.  I queried that address using law enforcement databases and learned that JESTER is currently on formal probation with Riverside

County and listing the Dillion Avenue address as his probation address.

86.   I then queried the vehicle in license plate reader databases.  I learned that the vehicle has multiple scans parked in the driveway located at on Windsor Drive in the City of Indio.  I queried this address using law enforcement databases and learned that this address is JESTER's mother's address, who lists the Windsor address as her current probation address.  I learned that she resides in that house with her children, one of them being JESTER.

87.   Later that same evening, Detective Blachley of the Cathedral City Police Department conducted surveillance at the Windsor Drive residence.  Detective Blachley saw the same black Mercedes SUV parked in the driveway.

88.   Based on my training and experience, individuals engaged in criminal activity who are currently on probation/parole will attempt to avoid detection from law enforcement by providing false addresses or driving vehicles that are not registered in their name.  Based on the information gathered from surveillance, I believe that JESTER resides at the Windsor Drive residence, drives the black Mercedes SUV, and was present with CABALLERO and VILLALOBOS in that vehicle following the controlled purchase.

89.   I queried the firearms in e-Trace to potentially identify a straw purchaser.  According to a multiple sales report, I learned that Derrick Kennedy purchased the firearms

the day before, all in one transaction, from an FFL located in the Phoenix area, a strong indicator of firearms trafficking.

**S.   Verizon Records for number ending in 4413**

90.   On or about June 6, 2023, I received records related to the phone number ending in 4413 from Verizon.

91.   I reviewed the records and learned that the phone number is associated with a Tracfone, which is a company offering prepaid phones.  Although Verizon supports the number, there is no customer information on file for the phone number.

92.   I reviewed the historical call/toll records for the phone and learned that the number only had recent activity.  I reviewed the numbers interacting with the 4413 number and observed interactions between the phone number ending in 1285 and another ending in 9651 on the day of the controlled purchase during the same timeframe of the controlled purchase.

93.   I queried the numbers using law enforcement databases and learned that the number ending in 1285 is registered to JESTER.  I also learned the number ending in 9651 is registered to VILLALOBOS.

**T.   Controlled Purchase and Surveillance on June 7, 2023**

94.   On June 7, 2023, the UC again communicated with M.D.C. on the number ending in 4413.  The UC and M.D.C. arranged a meeting location at the Chili's Restaurant in the City of Beaumont.  The UC and M.D.C. had discussed a controlled purchase for methamphetamine at a rate of $900 per pound, as well as three more firearms (two Glocks and one Draco).

95.  At approximately 4:30 p.m. two UCs, both wearing audio- and video-surveillance equipment, entered the Chili's Restaurant and met with M.D.C.  M.D.C. introduced himself to the UCs as "David" (M.D.C.'s middle name).  They sat in a booth and discussed firearms and narcotics transactions.  Following the meeting, M.D.C. stated that he had the two Glocks and Draco pistols available for sale in the parking lot.

96.  The UCs met with M.D.C. at VILLALOBOS's Mercedes Benz sedan in the parking lot out front of the restaurant. VILLALOBOS was sitting in the driver's seat waiting in the car. VILLALOBOS overheard the UCs speaking with M.D.C. and advised that the firearms were in a bag in the trunk of the vehicle. M.D.C. opened the trunk of the vehicle, and the UCs saw the same "Cookies" duffel bag that was used to carry the firearms on the previous controlled purchase at the UC location.  Inside the "Cookies" duffel bag was two Glock pistols and a Draco.  M.D.C. confirmed a sales price of $5,700.  The UCs took custody of the firearms and gave M.D.C. the money.

97.  Prior to the controlled purchase, ATF agents conducting surveillance had identified VILLALOBOS's Mercedes sedan and established surveillance of the vehicle.  At the conclusion of the controlled purchase, I drove to VILLALOBOS known address in the City of Moreno Valley and found her Mercedes sedan parked in the same parking spot as previously observed from past surveillance.

98.  Following the controlled purchase, I queried the firearms using law enforcement databases and learned that two of

the firearms were purchased one day before the controlled purchase in the State of Arizona by the same straw purchaser, Derrick Kennedy, and the third firearm was purchased approximately 14 days earlier.

99. Following this controlled purchase, M.D.C. remained unidentified.

**U.    GPS Ping Search Warrant Obtained**

100. On June 22, 2023, the United States Magistrate Judge Shashi H. Kewalramani signed a search warrant authorizing a GPS phone ping for M.D.C.'s 4413 phone number with the intent of locating M.D.C. and formally identifying him.  I monitored the pings and it appeared that M.D.C. was residing in the City of Moreno Valley.

101. At approximately 8:30 a.m. on June 29, 2023, ATF deployed a cell-site simulator in order to help locate the cellular phone.  According to the cell-site simulator, the phone was specifically located inside a residence on Heatherglen Road in the City of Moreno Valley.  I conducted surveillance of that residence and saw a vehicle parked directly in front of the residence on the curb.  The vehicle's license plate was queried using law enforcement databases and it was learned the vehicle is registered to CABALLERO.  Based on the vehicle being parked at the residence and the cellular phone number pinging inside the residence, I believe the residence is associated with CABALLERO and M.D.C.

V.   **Controlled Purchase, Surveillance and Vehicle Pursuit on June 29, 2023**

102. Prior to a June 29, 2023, controlled purchase, the UC and M.D.C. communicated using the number ending 4413.  The UC and M.D.C. agreed to a transaction consisting of five pounds of methamphetamine at $800 per pound and six firearms consisting of five Glock pistols for $1,300 per Glock and one Draco for $2,800 for a total of $13,300.  Both parties agreed to meet at El Portero Park in the City Moreno Valley.  The park was close to the Heatherglen residence.

103. At approximately 1:41 p.m., the UCs arrived in the Northwestern portion of the park on Camino Marilena.  ATF had established surveillance of the park at multiple locations.  Riverside County Sheriff's Department ("RSO") Deputies assigned to the Moreno Valley Special Enforcement Team ("SET") were also in the area in marked police units with lights and sirens assisting in the operation.

104. Prior to the UCs arriving at the park, ATF SA Keegan and I were driving south on Kitching than turned west onto Lupine Lane.  When driving on Lupine, SA Keegan and I noticed CABALLERO's Lexus from that morning and, directly behind it, JESTER's black Mercedes SUV.  I communicated the location of these vehicles to the SET Team.  I also advised them who the drivers were of both vehicles and that they were both currently on Riverside County probation with search terms.

105. The UCs arrived at the park, and, shortly after, M.D.C. emerged on foot from the east carrying two duffel bags

(one of them the same "Cookies" duffel bag from the previous controlled purchases).  M.D.C. met with the UCs and got into the UC vehicle.  The UCs paid M.D.C. $4,000 for the five pounds of methamphetamine.  The UCs then paid M.D.C. $9,300 for the firearms for a total of $13,300.  During the controlled purchase, I saw the black Mercedes SUV reposition and park on the west side of the park on Kitching Street near the dead end.

106. SA Keegan and I drove back to Lupine Lane and saw that CABALLERO's Lexus remained in the same location.  Once the UCs departed the area, ATF maintained surveillance on the black Mercedes SUV.  M.D.C. departed the UC vehicle on foot walking east on Camino Marilena, then appearing to go north on Via Pamplona.  The Mercedes SUV followed M.D.C.  SA Keegan and I followed the Mercedes SUV, later confirmed to being driven by JESTER, north on Via Pamplona.  M.D.C. was no longer visible, so it appeared that the black Mercedes SUV had picked him up.  JESTER then continued north and turned west on Lurin Avenue and made a loop back to Lupine Lane, stopping behind CABALLERO's Lexus.  I was communicating this information to the SET Team.  Once JESTER arrived back at the original location, I instructed the SET Team to contact the occupants of the black Mercedes SUV with the intent of formally identifying all of the parties involved in the illegal firearms and narcotics activity.

107. SA Keegan and I saw SET Deputies initiate a vehicle stop in their marked unit.  Shortly after, JESTER fled at high rates of speed.

108. JESTER initially drove through multiple residential streets at speeds exceeding 70 miles per hour while running posted stop signs.  Eventually, JESTER got onto Kitching Street travelling northbound at speeds more than 100 miles per hour. The vehicle then made an eastbound turn onto Iris Avenue running a traffic light and again accelerating at speeds over 100 miles per hour.  As the vehicle approached Lasselle Street it was forced to stop due to pedestrian vehicles stopped at a red light.  While at the light, JESTER intentionally hit the car in front of him to push it out of the way.  After hitting the car in front of the vehicle, JESTER than proceeded southbound over the curb and on to Lasselle Street continuing to travel south.

109. On Lasselle Street, the vehicle again accelerated to speeds over 100 miles per hour and made several dangerous maneuvers as JESTER was weaving in and out of traffic nearly crashing into a pedestrian vehicle while passing the Evans Road and Camino Delrey intersection (Lasselle Street turns into Evans Road).

110. The vehicle than went westbound onto Ramona Expressway again running a red light and accelerating at speeds more than 100 miles per hour.  As JESTER approached Perris Boulevard, he made a sudden southbound turn into a business complex.  In the complex, the vehicle drove at dangerous speeds before making a westbound turn in the complex towards Perris Boulevard.  As the vehicle approached Perris Boulevard, JESTER again drove over a curb before turning northbound onto Perris Boulevard.  While travelling northbound on Perris Boulevard, the vehicle began

weaving in and out of traffic.  While passing Modular way, JESTER lost control and struck the northeast curb line, causing the vehicles front right tire to go flat.  After striking the curb, the vehicle continued on Perris Boulevard making and east bound turn on Krameria Avenue back towards where the pursuit began.

111. JESTER again ran a stop sign than made a southbound turn onto Kitching Street where the vehicle accelerated to speeds over 90 miles per hour in a residential area approaching the park.  JESTER than ran the Kitching Street and Lurin Avenue stop sign.  The vehicle then made an eastbound turn onto Camino Marilena passing the original location of the controlled purchase.  JESTER than drove into the parking lot of El Portero Park, located at 16841 Via Pamplona.  From the parking lot, JESTER drove over the curb and began driving eastbound through the park.  The vehicle travelled approximately 200 yards over the grass before coming to a sudden stop at a pedestrian gate to a bridge that is backed up to a flood channel.  At the conclusion of the pursuit four Hispanic males exited the vehicle and began running eastbound towards the gate.

112. RSO SET Deputies also exited their vehicles and pursued the subjects on foot.  JESTER and CABALLERO were detained quickly near the gate at the beginning of the pedestrian bridge.  While the two other males, one of them M.D.C. and the fourth, later identified as Jose Alan Vazquez Sanchez, ran east over the bridge.  Both subjects then ran into the drainage ditch before running into a tunnel on the eastside

37

of the ditch.  SET Deputies proceeded to follow the two males approximately 500 yards into the tunnel.  As they were about to take one of the subjects into custody, he was observed crawling into a smaller tunnel and begin crawling southbound.  Due to officer safety reasons, he was no longer pursued.  Additionally, while running into the tunnel we lost all communication and deemed it unsafe to continue pursuing all the subjects.

113. Deputies exited the tunnel and proceeded to canvas the neighborhood.  While canvassing the neighborhood, a subject later identified as M.D.C., was seen walking on Lasselle Street and Krameria Avenue.  M.D.C. was covered in water, had scratches on his back, and no shirt on.  M.D.C. was subsequently detained. I looked at M.D.C.'s CDL license photo and later looked at M.D.C. while he was in custody and positively identified him as "David" and the subject ATF UC's had purchased firearms and narcotics from.  Deputy Smith also positively identified M.D.C. as one of the subjects who ran from the Mercedes in the park.

114. The fourth subject believed to be Sanchez was not located and remains outstanding.

115. Once CABALLERO was detained following the pursuit.  SA Keegan observed a deputy search CABALLERO recovering a set of car keys for his Lexus.  The deputy also located approximately $3,900 in cash in one pocket and approximately $9,300 in cash in his other pocket.  ATF Agents took custody of the items.  I believe this is the buy money the ATF UCs gave to M.D.C. during the controlled purchase, which M.D.C. in turn gave to CABALLERO. The ATF UCs also paid M.D.C. in separate stacks of money.  One

38

for $4,000 for the narcotics and $9,300 for the firearms.  The bills were photographed prior to the controlled purchase as well as the bills that were seized from CABALLERO.  I briefly compared the photographs taken of the funds before the purchase with that of the recovered funds off of CABALLERO and quickly identified at least 20 of the same bills, indicating that CABALLERO was in possession of the buy money.  Meaning that ATF UC's purchased the contraband directly from M.D.C. who than gave the funds to CABALLERO where they than would have been distributed amongst the involved parties including JESTER, which was interrupted by the vehicle stop and subsequent pursuit.

**W.  Probation Search of JESTER's Mercedes**

116. ATF Agents searched JESTER's Mercedes pursuant to his probation terms.  During a search of the vehicle, agents found two bags on the ground in the back seat of the vehicle, they were the same bags used during the controlled purchase earlier at the park.  One of the bags was the same "Cookies" duffle bag that was used the day at the park and in the past two controlled purchases.  In the trunk area of the car an owner's manual for a Draco pistol was found.  The same firearm purchased earlier.

117. In the front seat area of the car, SA Keegan located a large amount of cash rubber banded to package of prescription type pills, and a Rolex watch, located inside a blue shaving kit type bag.  In the center console area, SA Keegan found a Wells Fargo Debit Card with JESTER's name on it.  On the dashboard computer display of the vehicle the name "Josh" was in the top left corner.

### X.    Probation Search of CABALLERO's Lexus

118. ATF Agents and assisting officers from California Fire conducted a probation search of CABALLERO's Lexus.  Inside the vehicle, agents located indicia for CABALLERO.  In between the driver seat and the center console I observed a switch blade, which is a felony to possess in the State of California.  I seized the knife as contraband.  In the backseat, I observed a Seattle Mariners baseball cap that CABALLERO wore during a controlled purchase at the UC location.  I seized the hat as evidence.  Agents also observed the cane that CABALLERO had previously used.

119. Agents accessed CABALLERO's vehicle with the car keys that were found in his possession.

### Y.    Resident's Ring Camera

120. While searching CABALLERO's vehicle.  A resident came out and stated that his ring camera affixed to the northside of his house that captured video footage of the two vehicles (Lexus and Mercedes) and their occupants.  I observed the video footage and saw CABALLERO get out of the driver's seat and M.D.C exit the passenger seat and greet the occupants of the Mercedes SUV. Once everyone greets all four subjects get into JESTER's Mercedes.  JESTER sat in the driver seat, Sanchez sat in the front passenger seat, CABALLERO sat in the passenger side back seat, and M.D.C. sat in the driver side back seat.  The occupants remained in the vehicle where they were likely preparing the contraband for the controlled purchase.

121. After several minutes CABALLERO exits the vehicle and goes back to his Lexus and opens the passenger front seat door. He picks up a full grocery bag closes the door and returns to his seat inside the Mercedes.  I believe this grocery bag contained the majority of the methamphetamine.  When the ATF UC's purchased the narcotics some of it was contained in a Stater Bros plastic shopping baggie.

**Z.   Results of Controlled Purchase**

122. During the controlled purchase, the ATF UC's purchased the below items directly from M.D.C:

     a.   Romarm/Cugir, Mini Draco, 7.62mm pistol, s/n: 22PG-6970;

     b.   Glock, 21 Gen4, .45 caliber pistol, s/n: AHFR187;

     c.   Glock, 19, 9mm pistol, s/n: BYLZ524;;

     d.   Glock, 21, .45 caliber pistol, s/n: KYU556

     e.   Glock, 45, 9mm pistol, s/n: BYWP609;

     f.   Glock, 17, 9mm pistol, s/n: BYTY484; and

     g.   Approximately 2,323 grams (including packaging) of Methamphetamine.

123. On June 29, 2023, SA Duncan conducted a field test of the suspected methamphetamine.  The results were positive.

124. On July 1, 2023, I queried the firearms in e-Trace and observed a multiple sales report showing that Kennedy purchased all five Glock pistols on June 26, 2023, in Arizona.  It should be noted that in total nine handguns were purchased during this one transaction.  The Draco is still pending trace results.

### AA.  Interview of JESTER

125. SA Keegan and I interviewed JESTER back at the Moreno Valley Station.  I read JESTER his Miranda rights from a card. During the interview I asked JESTER about the firearms and where the firearms were coming from.  JESTER advised that himself and others associated with Northside Indio (criminal street gang) are involved with trafficking firearms from Arizona and selling them.  He stated that today he brought five Glocks and one Draco pistol from the Indio area.  I asked JESTER if he knew who was buying these firearms in Arizona and he stated a guy named "Derrick."  I showed JESTER a photograph of Derrick Kennedy and he identified him as the purchaser.

126. I asked JESTER if he goes to Arizona or if Kennedy transports the firearms out here, to which JESTER stated neither that associates of his will get rental cars in different people's names transport the firearms back to Indio.  JESTER stated that his involvement was primarily with transporting the firearms from his associates in Northside Indio to CABALLERO where they were being distributed.  I asked JESTER how many guns he thinks Kennedy has purchased, which he guessed as many as fifty.

127. I asked JESTER about past controlled purchases, and he stated that he was also present at the Beaumont controlled purchase as well as the controlled purchase in which surveillance units observed his vehicle at CABALLERO's house on Eucalyptus.

42

128. I asked JESTER about money if his Northside Indio associates pay him out or if he takes a cut from CABALLERO. JESTER stated he gets his profit from CABALLERO.

129. SA Keegan and I observed the ring camera footage and observed JESTER interacting with the driver of another vehicle. JESTER stated that was his brother, a juvenile, E.J. He said that he is not involved. I remembered E.J. from earlier on at the park when he came up to law enforcement identified himself and was asking about his brothers' car. I thought it was strange that he was there, but after seeing the ring camera video it now made more sense. I asked JESTER if he employed his younger brother to follow him to provide some sort of cover from law enforcement when JESTER was transporting firearms and narcotics from Indio. JESTER advised that was the purpose of his brother being at the scene.

130. SA Keegan and I asked JESTER about the five pounds of methamphetamine that was purchased by ATF UC's. JESTER stated that the methamphetamine was CABALLERO's deal and that he did not bring the methamphetamine. I asked JESTER if his fingerprints would be on the baggies when I check them for prints, and he stated that he did handle bags and/or a Ziploc box containing the bags of the methamphetamine. JESTER stated that he put a box, which contained methamphetamine, into a bag/backpack. That bag was one of the two bags used to deliver the contraband to ATF UC's. JESTER advised that he was aware of the methamphetamine but that he was not the source of the methamphetamine.

131. JESTER stated that all he knew about the purchase today was that he/they were selling the firearms and narcotics to the guy/s in a tow truck.

132. I asked JESTER about his cellular phones (SUBJECT DEVICE #1, SUBJECT DEVICE #6 and SUBJECT DEVICE #7) and if he would give us consent to search those phones.  JESTER stated that he would.  JESTER also signed a consent to search phone authorizing the search of SUBJECT DEVICES #1, SUBJECT DEVICE #6 and SUBJECT DEVIEC #7.

**BB.  Recovery of the SUBJECT DEVICES**

133. At the conclusion of the vehicle pursuit JESTER was taking into custody.  Deputy Garcia apprehended JESTER.  In JESTER's hand or near his person during the apprehension was SUBJECT DEVICE #1.

134. CABALLERO was also quickly detained by RSO Deputies. On or near CABALLERO's person was the SUBJECT DEVICE #2 and SUBJECT DEVICE #3.  While at the Moreno Valley station, I instructed the ATF UC to call the 4413 number.  When UC made that call, SUBJECT DEVICE #2 rang.  SUBJECT DEVICE #2 was the phone being pinged pursuant to a federal warrant.  The pings continued to come in throughout the incident and while the phone was present at station.  I than instructed the ATF UC to call CABALLERO's known personal phone number ending in 9339.  When the UC made that call, SUBJECT DEVICE #3 rang.

135. When M.D.C. was contacted and taken into custody by Deputies.  On his person, in his pockets, deputies located SUBJECT DEVICE #4 and SUBJECT DEVICE #5.  While at the station I

looked at the phones, the SUBJECT DEVICE #4 appeared to be off, and the SUBJECT DEVICE #5 was powered on, but I noticed on the screen it stated that it did not have a SIM Card.

136. Adjacent to JESTER's Mercedes SUV on the ground in a black Mercedes pouch/bag I located the SUBJECT DEVICE #6 and the SUBJECT DEVICE #7.  During the interview with JESTER, I asked if the phones found in the bag were his, JESTER stated that they were and that they were work phones he has from his employment at an Auto Body Shop.

137. It should be noted that I suspect, but I am not certain, that CABALLERO and M.D.C. had two "burner" phones, and would share one SIM card that had the same phone number.  This would explain why M.D.C. and CABALLERO had one phone with a SIM card and the other not.

### CC.  CABALLERO's Criminal History

138. During the investigation, CABALLERO had not been convicted of a felony, but he was arrested on August 19, 2022, by the Riverside County Sheriff's Department.  CABALLERO was out on bail for this case during the investigation.  CABALLERO has since been convicted, and CABALLERO is on felony probation.

139. On or about May 8, 2023, I reviewed the criminal history for CABALLERO and learned that CABALLERO was recently convicted of the following felony crime punishable by a term of imprisonment exceeding one year: On or about March 15, 2023, a violation of California Penal Code Section 25850(c)(6), Illegally Carrying a Firearm, in the Superior Court for the

State of California, County of Riverside, Case Number RIF2205079.

### DD. JESTER's Criminal History

140. On or about July 1, 2023, I reviewed the criminal history for JESTER and learned that JESTER has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year: On or about March 23, 2022, a violation of California Penal Code Section 25850(C)(6), Carry loaded firearm where person is not listed with DOJ, and Health and Safety Code Section 11375(B)(1), Possess for sale a controlled substance in the Superior Court for the State of California, County of Riverside, Case Number INF2101743.

### EE. Licensing Checks

141. ATF personnel queried the Federal Licensing System, and none of EDMUND, VILLALOBOS, JESTER, M.D.C nor CABALLERO have ever been licensed to deal in firearms.

### FF. Interstate Nexus

142. I am an ATF Interstate Nexus Expert, and I examined all of the firearms associated with this case and confirmed that all of the commercially manufactured firearms were manufactured outside of the State of California. Because the firearms were found in California, I believe that they have traveled in and affected interstate commerce.

## V. TRAINING AND EXPERIENCE ON FIREARM & DRUG TRAFFICKING

143. Based on my training and experience with firearm and drug trafficking, I know that:

46

a.   Individuals involved in firearm or narcotics trafficking often maintain records of their transactions and other records of evidentiary value for months or years at a time.  It is common, for example, for traffickers to keep pay/owe sheets or other records of narcotics sold and monies owed.  Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts.  Such records are often maintained for a substantial period of time even after the debts are collected.  Based on conversations with other agents, I have learned that such records are invaluable to traffickers and that such records are rarely discarded.  Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers, and coconspirators.

b.   Based on my training and experience, I know that firearm and narcotics traffickers will also keep additional documents and packaging related to narcotics transactions.  I know that traffickers will keep photographs, videos, and other documentation related to trafficking.  These can be kept in handwritten, typed, photocopied, or printed form or stored in some other electronic form, including magnetic, electronic, or optical storage device capable of storing data, such as cell phones, laptops, computers, tablets, printers, external hard drives and thumb drives, and personal digital assistance.

c.   Individuals involved in firearm or narcotics trafficking must often rely on others to obtain their firearms or drugs and to help them market.  Frequently, traffickers

47

maintain evidence of the identities of these co-conspirators on digital devices such as cellular phones.  The identities can be found in receipts, telephone records and bills, address books, distribution lists, customer lists, supplier lists, price lists, bank statements, letters, write transfer receipts, firearm and/or narcotics ledgers, letters and other correspondence, lists of firearms or narcotics acquired and disposed of, records related to travel for participating in firearms or narcotics trafficking conspiracy (including but not limited to airline, train, or bus tickets, hotel and restaurant receipts, gas receipts, rental vehicle receipts, passports, and credit card receipts) and other records related to sale, purchase, transfer, or possession of narcotics or firearms.

d.   Individuals involved in firearm or narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, vehicles, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace.  Records of these and other types of transactions are often found on digital devices of individuals trafficking.

e.   Individuals involved in firearm or narcotics trafficking often maintain cellular telephones for the purpose

48

of arranging transactions.  Persons attempting to arrange for the sale, purchase, transportation, and manufacture of firearms or controlled substances frequently will contact their illegal business customers, purveyors, and associates to negotiate business deals.  Further, it has been my experience that those involved in firearms and drug trafficking maintain contact information for other co-conspirators in their cellular telephones.  In particular, there is probable cause to believe that the following may be found stored on the SUBJECT DEVICES: Electronic records, communications, web searches, and data including, but not limited to emails, text messages, photographs, audio files, videos, and location data, on digital devices:

        i.   tending to identify efforts to possess or distribute firearms or controlled substances;

        ii.  tending to identify accounts, facilities, storage devices, and/or services-such as email addresses, IP addresses, and phone numbers-used to facilitate efforts to possess or distribute firearms or controlled substances;

        iii. tending to identify co-conspirators, criminal associates, or others involved in possessing or distributing firearms or controlled substances;

        iv.  tending to identify travel to or presence at locations involved in the possession or distribution of firearms or controlled substances, such as stash houses, load vehicles, or delivery points;

v.    tending to identify the user of, or persons with control over or access to, the digital devices; and/or

vi.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

144. It is also my opinion and belief that the above-described documents are currently possessed by firearms or narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date.  These documents are kept by traffickers whether or not the dealer is in possession of any firearms, drugs, or chemicals at any given moment.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

145. As used herein, the term "digital device" includes the SUBJECT DEVICES.

146. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

51

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

147. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

148. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

149. For all of the reasons described above, there is probable cause to believe that:

a.   CABALLERO committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of at Least 50 Grams of Methamphetamine) on August 11, 2022;

b.   EDMUND committed a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) on November 1, 2022;

c.   VILLALOBOS committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of at Least 50 Grams of Methamphetamine) on September 12, 2022; and

d.   JESTER committed violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of at least 50 Grams of Methamphetamine) and 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) on June 29, 2023.

150. Further, there is probable cause to believe that fruits, evidence, or instrumentalities of the SUBJECT OFFENSES will be found on the SUBJECT DEVICES.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this ___5th___ day of July 2023.

_____

HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

53